Marcia Silk Mills, Inc., et al. * v. Commissioner. Marcia Silk Mills, Inc. v. Commissioner
Docket Nos. 28563, 28590-28592, 38823, 38824.
United States Tax Court
T.C. Memo 1954-81; 1954 Tax Ct. Memo LEXIS 166; 13 T.C.M. (CCH) 585; T.C.M. (RIA) 54186; June 29, 1954, Filed *166 1. Petitioners understated their sales on their books and income tax returns. They used part of the proceeds of such omitted sales to purchase "black market" rayon and "scarce" rayon after the expiration of price controls. These purchases were not recorded, nor were deductions taken for them on petitioners' income tax returns. Held, respondent's determination of unreported sales is sustained, but petitioners are allowed a deduction for black-market purchases, as found herein. 2. Substantial portions of the income from unreported sales were fraudulently retained by the petitioners during 1943 to 1946 with intent to avoid the payment of taxes thereon. Held, penalty for fraud sustained for these years. 3. Deductions for officers' salaries by petitioner, Marcia Silk Mills, Inc., for its fiscal years ended November 30, 1947, and November 30, 1948, were unreasonable in amount. Held, respondent's determination of reasonable allowances for salaries is sustained. 4. Respondent disallowed deductions of $2,500 for traveling expenses by petitioner, Marcia Silk Mills, Inc. Such deductions were substantiated only by checks drawn to cash and notations on check stubs. Held, proper *167 amount of such deductions is $1,000. 5. Respondent determined that petitioners' distributive share of partnership income should be increased. However, petitioners were not fully apprised of the nature of the partnership adjustments either in the deficiency notices or at the hearing. They were disclosed only in respondent's brief. Held, deficiencies based thereon are sustained for failure of burden of proof. 6. Respondent determined that Dora Friedman was not a valid partner in Marcia Silk Mills during the taxable years 1943, 1944, and 1945. Held, no evidence having been introduced on this issue, respondent's determination is sustained. Murray M. Weinstein, Esq., 60 Park Place, Newark, N.J., for the petitioners. John E. Mahoney, Esq., for the respondent. RICE
*168 Memorandum Findings of Fact and Opinion RICE, Judge: These consolidated proceedings involve deficiencies in income tax and penalties determined against the respective petitioners, as follows: Marcia Silk Mills, Inc.
Docket No.
Year
Deficiency
Penalty (50%)
28563
Fiscal Year Ended 11/30/1947
$12,688.98
$ 5,926.53
28563
Fiscal Year Ended 11/30/1948
710.60
Paul Friedman
28590
1946
$ 7,116.26
$ 3,558.13
28590
1947
479.51
239.76
Max Friedman
38823
1943
$ 4,636.85
$ 2,318.43
38823
1944
17,631.53
8,815.77
38823
1945
21,521.10
10,760.55
28591
1946
6,988.68
3,494.34
28591
1947
444.85
222.43
Joseph Friedman
38824
1943
$ 4,488.43
$ 2,244.22
38824
1944
17,421.12
8,710.56
38824
1945
21,201.99
10,601.00
28592
1946
6,787.40
3,393.70
28592
1947
516.43
258.22
The issues to be decided are: (1) whether the petitioners understated their incomes in their respective income tax returns for each of the years involved; (2) if so, are petitioners liable for the 50 per cent fraud penalty for such years, as prescribed by section 293(b) of the Internal Revenue Code; (3) whether the deductions *169 for salaries by Marcia Silk Mills, Inc., for its fiscal years ended November 30, 1947, and November 30, 1948, were unreasonable in amount; (4) whether deductions of $2,500 for traveling expenses by Marcia Silk Mills, Inc., for its fiscal year ended November 30, 1947, were properly disallowed by the respondent; (5) whether respondent's determination of additional partnership income for 1946, aggregating $2,605 for the three individual petitioners, shall be sustained when these petitioners were not informed of the nature of the partnership adjustments in either the deficiency notices or at the hearing; and (6) whether Dora Friedman was a valid partner for tax purposes in the partnership known as Marcia Silk Mills during the taxable years 1943, 1944, and 1945. Some of the facts were stipulated. General Findings of Fact The stipulated facts are so found and are incorporated herein. The petitioners, Max, Joseph, and Paul Friedman (hereinafter sometimes referred to as Max, Joseph, and Paul, respectively), reside in the State of New Jersey and filed their income tax returns for the years here involved with the collector of internal revenue for the fifth district of New Jersey. During *170 these years, they were engaged in the manufacture of rayon ribbon for the florist trade; at first as a partnership, known as Marcia Silk Mills (hereinafter referred to as the partnership), and, after November 30, 1946, as a corporation, Marcia Silk Mills, Inc. (hereinafter referred to as the corporation). Both the partnership and the corporation were located in Paterson, New Jersey, and each filed its return with the collector of internal revenue for the fifth district of New Jersey. For convenience, petitioners Max, Joseph, and Paul, and the corporation will sometimes be referred to collectively as the petitioners. Issues 1 and 2 Findings of Fact During the years 1943-1947, rayon was in short supply due to wartime and post-war conditions. The petitioners were unable to procure regular deliveries and sufficient quantities of rayon yarn from their customary sources of supply to keep their 46-loom plant operating on a steady basis. They wrote to various rayon producers requesting that rayon be sold to them on the basis of priority and allocation orders which they had received from the Government, but were informed by the producers that their sales quotas had already been filled. *171 Petitioners resorted to the purchase of rayon yarn on the "black-market", paying cash on delivery. Rayon yarn continued to be in short supply for a period following the expiration of controls on November 10, 1946, and petitioners made additional cash purchases from the black-market sources during this period. For convenience only, these purchases will also be referred to as "black-market" purchases. Large amounts of cash were obtained by petitioners by requiring certain of their customers to pay in cash for their purchases. Elaborate efforts were made to conceal these sales. They were not entered on petitioners' books or reported on the partnership or corporation income tax returns. The customers received no invoices bearing the name of Marcia Silk Mills or Marcia Silk Mills, Inc. Bills of lading and shipping tickets were prepared with the cash purchasers named as both consignees and consignors. The respondent's determination of deficiencies is, for the most part, based on these unreported sales. The following table states the amounts reported as sales of the partnership for the years 1943, 1944, 1945, and its fiscal year ended November 30, 1946, and of the corporation for the *172 fiscal year ended November 30, 1947, together with the respondent's determination of unreported sales for these years: Reported
Unreported
Year
Sales
Sales
1943
$101,550.64
$13,613.59
1944
106,847.01
48,389.87
1945
95,771.76
69,995.18
Fiscal Year Ended
11/30/46
142,412.00
35,551.85
Fiscal Year Ended
11/30/47
147,635.73
6,985.10 *
Included in respondent's determination of total unreported sales for 1945 is the amount of $1,500 attributable to 4 shipments made by the partnership to Mitzi's Flower Shop, Chicago, Illinois, during October-December 1945. No invoices appear on the books of the partnership with dates corresponding to those of these 4 shipments. The last previous invoice recorded on the partnership's books for this account is dated September 1945. These shipments consisted of 21 cartons, weighing a total of 1,335 pounds. No invoices were received by petitioners for the black-market purchases of rayon yarn. Except for purchases aggregating *173 $3,760.82 during 1944, such purchases were not entered on petitioners' books or included in the cost of goods sold on the returns of the partnership or corporation. No records were kept as to the total cost of the remaining black-market purchases or of the price paid per pound for the rayon yarn obtained in this manner. Respondent made no allowance for the cost of black-market purchases in computing the deficiencies. In addition, respondent disallowed deductions taken for alleged purchases at O.P.A. prices, which had been entered on petitioners' books, but which they were unable to substantiate by the production of invoices, as follows: Year
Amount
1943
$ 193.20
1944
2,059.44
1945
112.50
Fiscal Year Ended 11/30/46
75.65
Fiscal Year Ended 11/30/47
41.85
All ribbon produced by petitioners was processed by an independent "finisher" to give it a required stiffness. On the basis of this finisher's invoices which show the total number of yards of ribbon produced each year, records submitted as to the width and construction of each pattern of ribbon, and a conversion table prepared by the American Viscose Company (which is accepted in the trade as an accurate *174 measure of the weight of rayon yarn required to manufacture a yard of cloth), the following table gives a satisfactorily accurate estimate of the number of pounds of rayon yarn used by the petitioners during the years in issue; together with the purchases of yarn, which were entered on petitioners' books and for which they have invoices; and a resulting estimate of their purchases of yarn on the black market: Recorded
Black-Market
Yarn Required
Purchases
Purchases *
Year
Pounds
Pounds
Pounds
1943
58,543.80
47,626.85
10,916.95
1944
65,315.70
41,532.05
23,783.65
1945
67,846.95
44,785.76
23,061.19
Fiscal Year Ended 11/30/46
78,357.94
61,141.25
17,216.69
Fiscal Year Ended 11/30/47
43,508.99
36,648.30
6,860.69
The O.P.A. price for the type of yarn used by the petitioners was generally 55" per pound. After O.P.A. ceilings were lifted, on November 10, 1946, petitioners paid, during the months of January through March of 1947, 62" per pound to primary producers *175 of the yarn and $1.50 and $1.80 per pound on several purchases from secondary sources. The average price paid by petitioners in the black market during the yars in issue, and the total unadjusted cost of year thus purchased, is as follows: Black-Market
Purchases
Price
Year
Pounds
Per Pound
Unadjusted Cost
1943
10,916.95
$ .75
$ 8,187.71
1944
23,783.65
1.00
23,783.65
1945
23,061.19
1.50
34,591.79
Fiscal Year Ended 11/30/46
17,216.69
1.50
25,825.04
Fiscal Year Ended 11/30/47
6,860.69
1.00
6,860.69 The amounts of black-market purchases, as stated in pounds, and the total cost, as stated in dollars, are overstated in the preceding table to the extent that they include certain purchases made at O.P.A. prices but disallowed by respondent because of the loss of invoices. The correct cost of the yarn purchased on the black market, taking this adjustment into account, is as follows: Unsubstantiated
Corrected
Unadjusted
O.P.A.
Black-Market
Year
Cost
Purchases
Purchases
1943
$ 8,187.71
$ 193.20
$ 7,994.51
1944
23,783.65
2,059.44
21,724.21
1945
34,591.79
112.50
34,479.29
Fiscal Year Ended 11/30/46
25,825.04
75.65
25,749.39
Fiscal Year Ended 11/30/47
6,860.69
41.85
6,818.84
*176 Part of the deficiencies of Max and Joseph for the taxable years 1943 through 1946, and of Paul for the taxable year 1946, was due to fraud with intent to evade the payment of taxes. No part of the deficiencies for the taxable year 1947 was due to fraud with intent to evade the payment of taxes. Opinion The issue is whether the admitted failure of the petitioners to record all sales resulted in understatements of their income during the years here involved; and, if so, whether such understatements were due to fraud with the intent to evade the payment of taxes. Petitioners introduced no evidence as to the amounts of these admittedly unreported sales, but contend, by way of defense, that whatever the amounts may have been, these sums were completely expended for the purchase of rayon yarn in the black market. Therefore, they urge that they received no additional income because the total of unreported sales in each year was counterbalanced by purchases which were not reflected on their books or income tax returns in the cost of goods sold. Although petitioners have submitted detailed computations in order to prove the amount of purchases which they did not take as deductions, *177 they have exerted little effort to prove the amounts of their unreported sales. Instead, they have relied on an attempt to discredit the respondent's evidence on this issue. Respondent introduced the testimony of 4 retailers to substantiate his determination of all but $1,500 of the unreported sales. These retailers stated that various checks which they had issued payable to cash or to fictitious persons were, in actuality, in payment for purchases from petitioners. Petitioners contend that, although these retailers' checks may be supported by shipping memoranda showing the receipt of merchandise from petitioners, there is no evidence proving that the entire cash proceeds of each check were received by petitioners. In the light of all the evidence, we are convinced that respondent's determination of the net amounts received by petitioners, as a result of unrecorded sales to these retailers, is correct. Respondent's agent testified that due allowance was made for these instances in which portions of the proceeds were retained by the retailers. The testimony of these retailers as to the amounts paid to petitioners was forthright and convincing and not shaken by petitioners on cross-examination. *178 Petitioners may not complain if their pattern of deception now prevents them from offering proof as to the amounts received in each instance from unrecorded sales to these retailers. Petitioners were under a duty to maintain adequate books and records for the purpose of enabling the respondent to determine the correct amount of income subject to tax. Section 54(a) of the Internal Revenue Code. [1] Regulations 111, Section 29.54-1. Had they done so, rather than attempt to conceal a substantial part of these sales by refusing to render proper invoices, requiring the payment of cash, and failing to enter the receipt of these sums on their books, they would not now be in this position. Included among the unreported sales of $69,995.18 determined by the respondent for 1945, was $1,500 which he attributed *179 to 4 shipments made to a customer in Chicago. Bills of lading were submitted showing that these 4 shipments, weighing a total of 1,335 pounds, were made to this customer during October, November, and December of 1945. No invoices with dates corresponding to these bills of lading were entered on petitioners' books. The last previous shipment made to this customer, for which an invoice was recorded on petitioners' books, was made in September of 1945. Petitioners argue that this determination of additional and unreported sales to the Chicago customer should not be sustained because of respondent's failure to introduce the testimony of the customer or a transcript of the customer's records. However, petitioners introduced no evidence of their own to show the nature of these 4 shipments, and we must conclude that they represent additional sales of merchandise. In the light of the evidence as to the value of previous shipments to the customer, we are satisfied that respondent's determination of the value of these 4 unrecorded shipments is a reasonable one. Having sustained respondent's determination of unreported sales, we must now consider petitioners' argument that, irrespective of *180 the amount of such sales, they did not result in additional income. Petitioners argue that the entire proceeds of such sales were expended for the purchase of rayon yarn in the black market; and, since no book entries or deductions were made for such purchases, they counterbalance the unrecorded sales and no additional income was earned. Although respondent made no allowance for such purchases, we are satisfied that substantial sums were spent for this purpose. However, it is, indeed, difficult to arrive at even their approximate amounts. We have adopted, in our findings of fact, petitioners' calculations of the poundage of rayon yarn which they required during the years in issue. By subtracting from this the purchases at O.P.A. prices which they entered on their books, we have been able to determine the approximate amounts of yarn which they purchased in the black market. The petitioners testified that they paid the following average prices for black-market purchases of rayon yarn during the years in issue: 1943
$1.00
1944
2.00
1945
3.00
1946
2.00
1947
1.50 But these were only estimates and they submitted no specific invoices or other written evidence *181 of the prices paid for various black-market purchases. As stated by the Court in Rugel v. Commissioner, 127 Fed. (2d) 393, 395 (C.A. 8, 1942): "A taxpayer always has the burden of establishing his right to any claimed deduction for income tax purposes. Where he seeks to have a deduction allowed by the Board of Tax Appeals, as an ordinary and necessary business expense, within the meaning of section 23(a) * * *, he must furnish as definite proof as is reasonably possible, in the situation and circumstances, of the nature and details of the expenditures claimed to have been made. * * *" We do not find petitioners' testimony as to the prices paid for black-market yarn convincing. Nor does any of their substantiating evidence, for the period under O.P.A. control, give us much help. All that we have are statements that rayon yarn was very scarce during these years, and that the O.P.A. price was generally 55" per pound. For the year 1947, after the expiration of controls, we are better able to arrive at an approximation of the price paid since the corporation submitted several invoices showing that prime producers were charging 62" per pound and that it paid $1.50 and $1.80 *182 per pound to secondary sources on several purchases during the early part of the year. Petitioners claimed to have had a list of their various black-market sources of supply in their possession at the time of the trial, but they appear to have made no effort to obtain the testimony of these people as to the prices paid or the total amounts of such purchases. Petitioners state that these purchases were not entered on their books because the sellers were fearful of prosecution for violation of O.P.A. regulations, and would discontinue sales to petitioners if they were not permitted to remain anonymous. However, this does not excuse their failure to maintain adequate records, nor does it explain their failure to enter such purchases made after the expiration of O.P.A. controls on rayon yarn. We should not be required to guess at the amount of a taxpayer's expenditures; and were it not for the rule of Cohan v. Commissioner, 39 Fed. (2d) 540 (C.A. 2, 1930), we might be inclined to allow petitioners no more than the O.P.A. price. However, we are convinced that the black-market prices which they paid were substantially in excess of the O.P.A. prices. Therefore, on the basis *183 of the record as a whole, bearing heavily upon the taxpayers in view of the fact that their inexactitude is of their own making, we have allowed the following amounts as the prices paid for yarn purchases in the black market and the total cost of such purchases: Price
per
Total
Year
Pound
Cost
1943
$ .75
$ 7,994.51
1944
1.00
21,724.21
1945
1.50
34,479.29
Fiscal Year Ended 11/30/46
1.50
25,749.39
Fiscal Year Ended 11/30/47
1.00
6,818.84 Petitioners may include these payments for black-market purchases in their cost of goods sold even though they include amounts paid in excess of O.P.A. ceiling prices. Lela Sullenger, 11 T.C. 1076 (1948). Petitioners argue on brief that Paul Friedman is not to be charged with his distributable share of any additional partnership income or constructive corporate dividends which the Court may find to have resulted from unreported sales. It is contended that Paul had no knowledge of these sales, or even of the cash purchases of black-market yarn, and that any additional income which may have resulted from these operations is to be charged equally to his father, Max, and his brother, Joseph. Although *184 Paul testified that he received no income not reported on his returns, we cannot believe that he was unaware of the very substantial cash purchases made in the black market, of the shipments made without invoices, of the bills of lading naming the consignee as the consignor, of the failure to record these sales on the books of the firm, in sum total of all the subterfuge carried on by the partnership and the corporation. The record indicates that this was a small, closely-knit organization, with Max, Joseph, and Paul participating to some extent in all its various activities, such as selling, purchasing, shipping, and supervision of help in the manufacturing process. Paul must have been aware of the black-market purchases and unrecorded sales. He is, therefore, chargeable with his proportionate share of the unreported income which we have found to have been earned in this manner. Respondent has proved by clear and convincing evidence the amount of unreported sales for each of the years in issue. Applying the cost of black-market purchases against such unreported sales, there still remains unexplained income from unreported sales in the following amounts: Unreported
Black-Market
Unexplained
Year
Sales
Purchases
Income
1943
$13,613.59
$ 7,994.51
$ 5,619.08
1944
48,389.87
21,724.21
26,665.66
1945
69,995.18
34,479.29
35,515.89
Fiscal Year Ended 11/30/46
35,551.85
25,749.39
9,802.46
Fiscal Year Ended 11/30/47
6,985.10
6,818.84
166.26
*185 We are convinced that in each of the years 1943 through 1946 petitioners Max and Joseph, and in the year 1946 petitioner Paul, fraudulently retained and failed to report parts of such unexplained income with intent to avoid the payment of taxes. Although these amounts are necessarily based on estimates, their large size convinces us that, regardless of minor errors in the estimates, Max, Joseph, and Paul were the recipients, in each of the years indicated, of substantial amounts of fraudulenty, unreported income. The small amount of unexplained income in the fiscal year ended November 30, 1947, leaves no allowance for possible errors in the estimate. We, therefore, found that for that year respondent has not borne his burden of proving fraud on the part of any of the petitioners. However, the pattern of conduct in the other years compels us to conclude that respondent has correctly determined the penalty for fraud. Elaborate efforts were made to conceal this income by a series of transactions in large sums of cash extending over a period of years, a complete failure to keep records of such transactions, the falsification of shipping documents, and the refusal to render proper invoices *186 to customers. Although it was claimed that a list of the recipients of this income was available at the hearing, no effort was made to introduce it. Self-serving statements of a taxpayer cannot eliminate the implication that the failure to keep records of transactions involving many thousands of dollars was due to fraudulent intent. The whole pattern of artifice and subterfuge evidences a purpose to evade the payment of taxes. See Jack M. Chesbro, 21 T.C. 123 (1953). Issue 3 Findings of Fact During the period January 1, 1943, to December 31, 1945, Max, his wife, Dora, and his son, Joseph, were listed as equal partners on the annual returns of the partnership. After coming out of service, Max's son, Paul, joined the partnership on January 1, 1946. The partnership return for 1946 shows Max, Joseph, and Paul as the three sole partners, each drawing an equal share of partnership income. Max has been in the textile business during his entire adult life, and in the ribbon business since 1938. Joseph, also, had many years of experience in the textile business at the time of the hearing. Paul received technical training in the operation of a textile mill at college; and, *187 after returning from a period of military service, he took further refresher courses in Paterson. Max designed the various patterns of ribbon being manufactured, but otherwise, there was no strict division of duties in the plant. The three officers supervised the activities of the employees and kept the looms in repair. These looms were quite old and required frequent repairs. Both Joseph and Paul also acted as salesmen for the firm. During the years here in issue, the petitioners frequently worked during evenings and week-ends. On December 1, 1946, the form of doing business was changed from a partnership to a corporation, Marcia Silk Mills, Inc., with Max as president, Joseph as treasurer, and Paul as secretary. This corporation continued the business activities of the partnership until June 1947. At that time, a new company, Marcia Textile Mills, Inc. (hereinafter referred to as the operating company), was formed to take over all the manufacturing activities of the corporation. Thereafter, the corporation leased its machinery and subleased its factory building to the operating company. It discontinued all manufacturing activities and became a holding company. It paid rents on *188 its factory building and received rents from the operating company for the use of the factory building and machinery. The three sole stockholders of the corporation continued the ribbon-manufacturing business under the new corporate name of the operating company. The arrangement by which the plant and machines were leased was not a written one, but was based on a rather informal oral agreement. There was no arm's-length dealing between the corporation and the operating company. As of November 30, 1947, the machinery leased by the corporation had an adjusted basis (depreciated) of $1,097.46. For its taxable years ended November 30, 1947, and November 30, 1948, the corporation received and paid rentals, paid salaries to its three equal officer-stockholders, and earned profits or losses, as follows: Fiscal Year
Fiscal Year
Ended
Ended
11/30/47
11/30/48
Rent Received
$ 4,250.00
$10,200.00
Rent Paid
4,411.78
3,254.90
Salaries Paid: Max
9,050.00
2,600.00
Joseph
12,050.00
2,600.00
Paul
12,050.00
2,600.00
Net Profit or Loss
26,080.80
(2,133.18)
The corporation used the net operating loss of $2,133.18, reported for its taxable year ended November 30, 1948, as *189 a carry-back to its taxable year ended November 30, 1947. Respondent disallowed 5/12 of the $33,150 deduction taken by the corporation for salaries paid to its three officers for the taxable year 1947. Respondent reasoned that during the final 5 months of that taxable year, the corporation had ceased its manufacturing operations, and that the salaries were unreasonable in the light of the services rendered to it by its officers during this period. The respondent determined that $2,600 was a reasonable allowance for the total annual salaries of the three officers in return for the limited services required of them by the corporation. He allowed the corporation a deduction of 5/12 of this $2,600 for the final 5 months of its taxable year 1947. The corporation took total deductions of $7,800 for the salaries of its three officers on its return for the taxable year 1948. Respondent disallowed all but $2,600 of this amount on the basis that there had been no change in the limited duties required of the three officers. A reasonable allowance for the compensation of Max, Joseph, and Paul Friedman by the corporation is $20,420.83 for the taxable year ended November 30, 1947, and $2,600 *190 for the taxable year ended November 30, 1948. Opinion Respondent argues that the duties required of the corporation's officers, after it became simply a lessor of its machinery and a sublessor of its plant in June 1947, were so limited that a reasonable total compensation for the three officers, within the meaning of section 23(a)(1)(A) of the Internal Revenue Code, should not exceed $2,600 per year during this period. He has, therefore, adjusted the salary deductions taken by the corporation for its taxable year 1947, in which it had 7 months of operating income, so as to allow 7/12 of those deductions as reasonable in view of the duties required in managing the corporation's ribbon-manufacturing activities. For the remaining 5 months of that year, during which it functioned as a holding company, he has allowed a total deduction of $1,083.33, computed at the rate of $2,600 a year for the three officers. Respondent allowed the corporation $2,600 for the total compensation of its three officers for its taxable year 1948, instead of the $7,800 which it had claimed on its return. Max, Joseph, and Paul testified that there was an informal, oral agreement whereby *191 the corporation was to keep the looms and plant in good repair. There was also testimony as to the age of the looms and their frequent need of repair, the number of hours devoted to this activity, and the average hourly pay earned by the loom-fixers. However, this entire transaction, whereby the corporation divested itself of its manufacturing activities and became merely a collector and payor of rents, is devoid of arm's-length dealings. We are not convinced from this record that the machinery and plant were kept in repair by Max, Joseph, and Paul in their roles as officers of the corporation rather than as part of their duties as principals in the operating company. There is no single criterion by which the reasonableness of compensation in any particular case can be measured, and the question is one of fact to be determined by the precise facts of each case. William S. Gray & Co. v. United States, 68 Ct. Cl. 480, 35 Fed. (2d) 968 (1929). Looking at all the aspects of this case, we feel that respondent's allowance of $5,640.28, $7,390.28, and $7,390.28 for the salaries of Max, Joseph, and Paul, respectively, for the taxable year 1947 was a reasonable one. The burden *192 of proof is on the petitioner to show that respondent's determination is unreasonable. The respondent has allowed the deduction of the pro rata portion of the total claimed compensation for the period during which the corporation was actively engaged in manufacturing. It is to be presumed that these three officers received similar compensation during the final months of the year from the operating company which took over the manufacturing functions after June 1947. There has been no convincing proof that a total compensation of $2,600 a year, during the holding-company period, is an unreasonable one. We have not been persuaded that the duties of the three officers went much beyond the payment and collection of rents. Respondent's determination of a reasonable allowance for salaries of the three officers for the corporation's fiscal years ended November 30, 1947, and November 30, 1948, is, therefore, sustained. Issue 4 Findings of Fact The respondent disallowed a $2,500 deduction taken by the operating company for traveling and general expenses on its return for the taxable year 1947. These deductions were supported on its books and records by 5 monthly checks of $300 each made *193 out to cash and designated on the checkbook stubs as being for "travel, entertainment, and petty cash", and also by 2 checks for cash of $500 each. One of these $500 checks was issued on December 24, 1946, and its stub bore the notation "Christmas"; the other $500 check was made out in April 1947, and "Easter Party" had been entered on its stub. No bills or other documentary evidence were submitted to support these deductions. The operating company was allowed various other deductions for traveling expenses. Portions of the above checks were expended by petitioner for additional traveling expenses, postage, gifts to customers, tips to truckmen and deliverymen, and parties for the employees at Christmas and Easter. A reasonable estimate of the total amount expended in this manner, from the proceeds of these checks drawn to cash, is $1,000. Opinion Save for 7 checks made out to cash and the corresponding check stubs bearing the notations, "travel, entertainment and petty cash", "Christmas", and "Easter Party", these deductions were unsubstantiated by bills or other documentary evidence. We appreciate that a taxpayer may feel the requirement that he keep adequate records of numerous *194 daily expenditures which he deems minor and trifling to be an irksome one. But as is the case here, such expenditures usually add up to a substantial sum over the course of a year, and the respondent is clearly justified in requiring that they be substantiated by something more definite than a notation on a check-book stub and the oral explanation of the taxpayer. Even though receipted bills may not always be possible, detailed records of such expenditures could be kept at the time they are made, disclosing the purpose, the amount, and the recipient. Certainly, in the instant case, an itemization could easily have been prepared at the time of each of the parties for the employees, disclosing the exact manner in which $500 was spent each time. However, we are convinced from the oral testimony that at least substantial portions of the $2,500 were spent on such deductible items as traveling expenses, postage, gratuities to customers and deliverymen, and the parties for the employees. On the basis of the Cohan rule, supra, we have, therefore, found that $1,000 was spent in this manner. Issue 5 Findings of Fact In the deficiency notices received by each of the petitioners, Max, Joseph, *195 and Paul, the respondent gave the following explanation for the increase of their distributive shares of partnership income for 1946: "It has been determined that your distributive share of the partnership, Marcia Silk Mills, 25 Mill Street, Paterson, New Jersey, for the taxable year 1946 was $25,327.43, instead of $12,608.48 as shown in your return, resulting in an adjustment of $12,718.95." In their petitions, Max, Joseph, and Paul denied that there was additional partnership income distributable to them for the year 1946, and each of them further alleged that "the basis of such determination as made by the respondent is unknown to him". At the hearing, respondent introduced evidence as to unreported partnership sales for 1946 amounting to $35,551.85. No other adjustments in partnership income for that year were discussed at the hearing. On brief, respondent requested a finding of fact that, in addition to unreported partnership sales of $35,551.85 for 1946, the Court find the following: Uncontested items to be added: (a) Traveling expense
$2,200.00
(b) Contributions
405.00
$2,605.00
Opinion Max, Joseph, and Paul contend that they requested of respondent, *196 prior to the hearing, a break-down of the adjustment in partnership income for 1946 and that they were informed that it was wholly attributable to unreported sales. In opening remarks to the Court, petitioners' counsel stated that the entire $38,156.85 of partnership income in issue for 1946 was attributable to unrecorded sales. Respondent's counsel, in his opening statement, attributed but $35,551.85 to unreported sales, but failed to mention the basis for the $2,605 balance of additional income which had been determined. Nor was any evidence introduced to explain the disallowance of these two items. Respondent requests, in his brief, that the Court sustain his determination increasing the partnership income by $2,605, on the basis that this item has not been contested. Accordingly, he asks that we find the partnership to have taken unallowable deductions of $2,200 for traveling and $405 for contributions. Max, Joseph, and Paul argue that they were not sufficiently apprised of the nature of this adjustment as to be able to contest it. Consequently, they urge that respondent's determination of deficiencies based on this $2,605 adjustment must be denied. However, respondent's determination *197 of deficiencies is presumptively correct, and the burden of proof is on the petitioners to overcome this. If a petitioner is dubious about the exact nature of an adjustment, he may, under the rules of this Court, move that the respondent provide "a further and better statement of the nature of the claim." Rule 18. It appears, from a statement on brief by petitioners' attorney, that respondent had orally stated that the entire 1946 partnership adjustment was based on unreported sales. If so, respondent has changed his position, and petitioners were surprised when they learned of this in respondent's brief. However, this cannot relieve them of their burden of proof. They may, if they now desire, make an appropriate motion for our consideration of any evidence which the parties may wish to introduce on these adjustments amounting to $2,605. Issue 6 Findings of Fact Respondent determined that Dora Friedman was not a valid partner in the partnership during the taxable years 1943, 1944, and 1945, and that the distributive share of partnership income allocated to her on the partnership returns should be allocated equally to Max and Joseph. Petitioners Max and Joseph contested this *198 adjustment in their pleadings, but no evidence was introduced on it during the hearing. Dora was not a bona fide partner during 1943, 1944, and 1945. Opinion This last issue concerns the validity of Dora Friedman's alleged membership in the partnership during the taxable years 1943, 1944, and 1945. No evidence was submitted on this matter, and we must, therefore, deem it to have been conceded. Petitioners contend that if Dora Friedman is not accepted as a valid partner, the distributive share of the partnership earnings which has been allocated to her should be charged entirely to her husband, Max, rather than equally to Max and his son, Joseph. In his opening remarks at the hearing, respondent's counsel stated that Dora "never had control of her purported distributable partnership earnings, because her husband, Max, controlled these funds * * *." We think this equivalent to a concession by respondent that Max's distributive share of the partnership income was 2/3 and that Joseph received but 1/3. Consequently, partnership income which had previously been allocated to Dora must be charged entirely to her husband, Max. Decisions will be entered under Rule 50. Footnotes
*. The following proceedings have been consolidated: ↩
Petitioner
Docket No.
Year
Marcia Silk Mills, Inc.
28563
Fiscal Years Ended 11/30/47, 11/30/48
Paul Friedman
28590
1946, 1947
Max Friedman
28591, 38823
1943, 1944, 1945, 1946, 1947
Joseph Friedman
28592, 38824
1943, 1944, 1945, 1946, 1947
*. $3,816.80 of these sales were made during December 1946. Respondent determined that these represented constructive dividends and, therefore, additional income of the petitioners during 1946.↩
*. The amounts in this column are overstated to the extent that they include purchases made at O.P.A. prices, but disallowed by respondent due to the loss of the invoices.↩
1. SEC. 54. RECORDS AND SPECIAL RETURNS. (a) By Taxpayer. - Every person liable to any tax imposed by this chapter or for the collection thereof, shall keep such records, render under oath such statements, make such returns, and comply with such rules and regulations, as the Commissioner, with the approval of the Secretary, may from time to time prescribe.↩